IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| -vs- | ) | No. CR-12-01-HE |
| | ) | |
| JULIUS LEE TURRENTINE, | ) | |
| | ) | |
| Defendant. | ) | |

**GOVERNMENT'S CORRECTED RESPONSE TO JULIUS LEE TURRENTINE'S MOTION TO SUPPRESS EVIDENCE OBTAINED AS A RESULT OF AN ILLEGAL SEARCH AND SEIZURE IN VIOLATION OF THE FOURTH AMENDMENT AND THE EQUAL PROTECTION CLAUSE OF THE UNITED STATES CONSTITUTION WITH BRIEF IN SUPPORT**

The United States hereby responds to "Julius Lee Turrentine's Motion to Suppress Evidence Obtained as a Result of an Illegal Search and Seizure in Violation of the Fourth Amendment and the Equal Protection Clause of the United States Constitution with Brief in Support" (Doc. 38) filed by defendant Julius Lee Turrentine. The defendant seeks to suppress all physical evidence seized by the Oklahoma Highway Patrol during a November 23, 2011 traffic stop on the Turner Turnpike in the Western District of Oklahoma. In support of his argument, defendant claims the Oklahoma Highway Patrol (OHP) Trooper did not have a valid justification for the traffic stop, the length of the stop was unreasonably long, no applicable warrantless search exception existed under the circumstances of this case, and the defendant was stopped because he was African-American. The government submits the defendant has asserted no viable claims warranting suppression and therefore, the motion should be denied.

## STATEMENT OF FACTS

On January 4, 2012, a federal grand jury returned a one-Count Indictment charging the defendant, and a co-defendant, Jimmie Eugene Johnson, Jr. (Johnson), with knowingly conspiring, on or about November 23, 2011, to possess with intent to distribute and to distribute 5 kilograms or more of a mixture or substance containing a detectable amount of cocaine powder. On the morning of Wednesday, November 23, 2011,OHP Trooper Clint Painter (Trooper Painter) was conducting routine patrol on the Turner Turnpike at the Mainline Toll Plaza in Lincoln County, Oklahoma. At approximately 6:50 am, he observed an eastbound traveling, silver GMC Acadia, bearing Ohio license plate, FHA1351, fail to signal as it exited the Turner Turnpike at the Mainline Plaza to pay its toll. The government anticipates that testimony, along with the audio and video recording from Trooper Painter's patrol car, will establish the following series of events:

Trooper Painter activated his emergency lights and conducted a traffic stop on the Acadia, in Creek County, Oklahoma, as it exited the Mainline Toll Plaza. Trooper Painter noticed that when he activated his emergency lights the passenger, later identified as Johnson, quickly raised up and looked back at the patrol car. Trooper Painter approached the vehicle from the passenger side and noticed that Johnson was acting as if he was asleep. Trooper Painter noticed that Johnson exhibited signs of nervousness--to include heavy breathing and a visible heartbeat in his neck. Trooper Painter advised the driver, the defendant, of the reason for the stop and asked for his driver's license. The defendant handed Trooper Painter a Missouri driver's license. The defendant denied failing to signal as he exited the turnpike and

2

Trooper Painter advised the defendant he (Trooper Painter) was staring at the defendant's vehicle when the violation occurred. Trooper Painter advised the defendant he would only receive a warning for the violation and asked the defendant to come sit in the patrol vehicle while the warning was completed.

While Trooper Painter was conducting his duties associated with issuing the warning, he engaged the defendant in conversation concerning his travel plans. The defendant indicated he and Johnson were returning home, to St. Louis, after having been in Las Vegas gambling for a couple of days. The defendant indicated they were trying to get home before Thanksgiving. Trooper Painter noticed the defendant, like the passenger, also exhibited signs of nervousness, including providing short, abrupt answers, failing to make eye contact during the conversation, and breathing in an accelerated manner. Trooper Painter asked the defendant where he and Johnson gambled and the defendant replied "all over." Trooper Painter then contacted dispatch to determine the validity of the defendant's license and whether he had any active warrants. Trooper Painter asked the defendant if he won any money while gambling and he said "no." Dispatch confirmed the validity of the defendant's driver's license and indicated he did not have any active warrants.

Trooper Painter asked the defendant if the vehicle he was driving was a rental. The defendant replied in the affirmative and indicated that Johnson, who he identified as "Jimmie", rented the vehicle and likely had the rental agreement. Trooper Painter asked the defendant what he did for a living and he replied "tow truck." Trooper Painter asked the defendant when he and Johnson left to go to Vegas and he replied "Saturday, I think it was." The defendant

stated they got to Vegas on Sunday, went straight to the casino, gambled for a couple of days, and then started heading back. Trooper Painter asked the defendant if they gambled for forty-eight hours straight and the defendant replied "yeah." Trooper Painter then asked the defendant if they slept any and the defendant indicated they slept in the vehicle. The defendant further offered that they stayed at "The Hampton, probably." Trooper Painter asked if the defendant stayed in the car at The Hampton and the defendant replied "yes." Trooper Painter asked the defendant why he chose the Hampton Inn and the defendant indicated he did not know---they "just did." Trooper Painter noticed the defendant's nervousness continued to increase during the conversation.

Trooper Painter approached the passenger side of the rental vehicle again and attempted to make contact with Johnson. Trooper Painter noticed that the passenger was continuing to act as if he was asleep. Trooper Painter asked Johnson for his identification and for the rental agreement. Trooper Painter asked Johnson where he and the defendant were coming from. Johnson was silent. Trooper Painter repeated his question and Johnson replied "visiting." Trooper Painter asked where they visited. Johnson indicated he was having problems finding his identification and needed to step out of the vehicle. Trooper Painter allowed Johnson to step out of the vehicle. Trooper Painter repeated his question and Johnson indicated they were visiting people in "Oklahoma." Trooper Painter asked where in Oklahoma and Johnson replied "Oklahoma City." Trooper Painter asked how long they had been visiting and Johnson replied "a couple of days." Trooper Painter asked if they had been anywhere else and Johnson replied "nope." Trooper Painter received Johnson's license and the rental

agreement and returned to his patrol vehicle.

Trooper Painter asked the defendant if Johnson won any money while they were in Vegas and the defendant responded "I don't think so; I don't think he did too well." Trooper Painter asked the defendant if he and Johnson stayed anywhere else besides Vegas and the defendant replied "no." Trooper Painter asked the defendant about Johnson's employment and he responded that Johnson owned a restaurant. Trooper Painter asked the defendant how the tow truck business was going and the defendant responded "it's okay." Trooper Painter then completed the defendant's violation warning, handed it to him, and asked him if he would he would return Johnson's license and the rental agreement. The defendant replied "yes" and then asked "is that it?" Trooper Painter replied "that's it."

The defendant then opened the patrol vehicle door and began to exit. While exiting, Trooper Painter asked the defendant if he could ask him some additional questions. The defendant indicated he did not want to consent to additional questions and was "ready to go." Trooper Painter advised the defendant he was being detained due to discrepancies in his and Johnson's story and their signs of nervousness. Trooper Painter advised the defendant he (Trooper Painter) was going to request a drug-detecting canine conduct a sniff on the vehicle and if the dog alerted to the presence of narcotics then the vehicle would be searched. Within two minutes, Trooper Ty Owen and CLEET[1] certified patrol service canine, Kojak, arrived at the scene of the traffic stop. Kojak was deployed around the vehicle and alerted positively to the presence of narcotics. The rental vehicle was searched and approximately eleven (11)

---

[1]CLEET stands for Council on law enforcement education and training.

kilograms of powder cocaine was found in a natural void in the vehicle. The defendant and

Johnson were then arrested.

<u>**ARGUMENT AND AUTHORITIES**</u>

"In applying the Fourth Amendment protections against unreasonable searches and

seizures, the Supreme Court has recognized three types of police-citizen encounters:

consensual encounters, investigative detentions, and arrests." *United States v. Kitchell*, 653

F.3d 1206, 1216 (10th Cir. 2011). "Because a routine traffic stop is more analogous to an

investigative detention than a custodial arrest, the principles set forth in *Terry v. Ohio*, 392 U.S.

1 (1968), guide [a] Court's determination as to the reasonableness of a traffic stop." *Kitchell*,

653 F.3d at 1216 (internal quotations omitted). *Terry* requires a court to examine whether the

traffic stop was "(1)justified at its inception, and (2) reasonably related in scope to the

circumstances which justified the interference in the first place." *Id*.

**I.       Trooper Painter conducted a lawful traffic stop.**

"A traffic stop is justified at its inception if an officer has (1) probable cause to

believe a traffic violation has occurred, or (2) a reasonable articulable suspicion that a

particular motorist has violated any of the traffic or equipment regulations of the jurisdiction."

*Id*. The government "[n]eed not show a violation occurred to justify an initial traffic stop." *Id*.

The Court applies an objective standard in reviewing a traffic stop and has "[l]ong since

rejected the notion that an officer's subjective motivations in effecting a stop are relevant to the

*Terry* analysis." *United States v. Winder*, 557 F.3d 1129, 1134 (10th Cir. 2009).

Trooper Painter's traffic stop on the defendant's vehicle was based, at a minimum, on

reasonable suspicion of a state law traffic violation; that is, failure to signal a lane change. Under Oklahoma law: "A vehicle shall not be moved from the lane until the driver has first ascertained that the movement can be made with safety and then given a signal, not less than the last one hundred (100) feet traveled by the vehicle, of his intention to change lanes. " Okla. Stat. tit. 47, § 11-309(2).

Trooper Painter observed the defendant's car fail to signal as it exited Interstate 44 to approach the Mainline Toll Plaza. When Trooper Painter activated his emergency lights, his patrol car's dashboard camera began recording. *See* Trooper Video at 0:00:00 to 0:01:23[2]. The viewer of the video cannot see the traffic violation because it occurred outside of the view of the camera, however the video does depict Trooper Painter advising the defendant of the reason for the stop. Trooper Video at 0:02:03.[3] The government submits the defendant's failure to signal as he exited I-44 to pay his toll constitutes both probable cause and reasonable suspicion that the defendant committed a traffic violation. *See Kitchell*, 653 F.3d at 1217 ("The Tenth Circuit, applying Oklahoma law, . . . has concluded that a turn signal is always required when entering a toll-booth area from the main turnpike."). Accordingly, Trooper Painter conducted a lawful traffic stop.

### A.    Defendant's claim that the traffic stop was racially motivated is meritless.

---

[2]Attachment 1- Trooper Painter Audio and Video Recording of Defendant's Stop ("Trooper Video"). This video was produced to the defendant in discovery at TUR_90.

[3]The government recognizes that the Trooper Video depicts the defendant signaling a lane change after exiting the toll plaza before being stopped by the trooper, and that the defendant disputed the reason for the stop, however the government still submits the Trooper had reasonable suspicion to conduct a traffic stop based on an observed traffic violation prior to the defendant's entry into the toll plaza.

The defendant asserts the traffic stop was conducted because the occupants of the vehicle were African-American and therefore, the evidence should be suppressed in violation of the Equal Protection Clause. The Supreme Court has clearly held subjective intentions play no role in ordinary, probable-cause Fourth Amendment analysis. *See Whren v. United States*, 517 U.S. 806, 813 (1996). Furthermore, "racial profiling issues concerning the intentional discriminatory application of the law are the province of the Equal Protection Clause." *United States v. Flores-Olmos*, 438 Fed. Appx. 713, 716 (10th Cir. 2011) (unpublished) (holding that court properly denied suppression motion where defendant raised no viable argument as to racial profiling); *United States v. Arreola-Delgado*, 137 F.Supp.2d 1240, 1248 (D. Kan. 2001) (finding defendant's claim of racial profiling meritless where defendant attempted to rely on racial profiling in single traffic stop instead of showing programmatic racial profiling). In analyzing a charge of racial profiling in the context of a traffic stop, the defendant must present evidence of a discriminatory purpose and a discriminatory effect. *Flores-Olmos*, 438 Fed. Appx. at 716 (outlining evidence that must be presented to prove discriminatory effect and purpose.)

The defendant has failed to establish his burden. Not only does the defendant not submit any supporting case law warranting suppression; he also fails to assert any facts, other than conclusory statements, that he was stopped because he was an African American. To the contrary, the evidence shows that Trooper Painter stopped the vehicle because of the observed traffic violation. Therefore, the stop was justified at its inception.

**II.     Trooper Painter's conduct during the detention was reasonably related in scope to the circumstances that justified the initial stop.**

An "[i]nvestigative detention usually must last no longer than is necessary to effectuate the purpose of the stop, and the scope of the detention must be carefully tailored to its underlying justification." *Kitchell*, 653 F.3d at 1217. It is well established "[t]hat a law enforcement officer conducting a traffic stop may generally request a driver's license, registration, and other required papers, run requisite computer checks, and issue citations or warnings as appropriate." *Id.*; *see also United States v. Rivera*, 867 F.2d 1261, 1263 (noting that an officer can legitimately ask questions about identity and travel plans of occupants in vehicle); *see also United States v. Hernandez*, 93 F.3d 1493, 1499 (10th Cir. 1996) (officer's questions about driver's destination and relationship to passenger were permissible as a matter of course and did not exceed the proper scope of a traffic stop). "Implicit in the authority to ask these questions is the authority to follow up on them when the answers are suspicious." *United States v. Garcia*, 87 Fed. Appx. 707, 709 (10th Cir. 2004) (unpublished). While a traffic stop is ongoing, "[a]n officer has wide discretion to take reasonable precautions to protect his safety." *United States v. Rice*, 483 F.3d 1079, 1084 (10th Cir. 2007). "Obvious precautions include running a background check on the driver and removing the occupants from the vehicle." *Id.* "Furthermore, because passengers present a risk to officer safety equal to the risk presented by the driver, an officer may ask for identification from passengers and run background checks on them as well." *Id.*

Trooper Painter conducted the necessary tasks associated with issuing a warning for the traffic violation of failing to signal before changing lanes. After first approaching the defendant's vehicle, Trooper Painter asked the defendant to come back to his patrol car so he

could issue him a warning and so he could separate the two occupants to avoid any officer

safety issues. Trooper Video at 0:02:12. Once the defendant and Trooper Painter entered the

vehicle, Trooper Painter asked the defendant about his travel plans and destination. Trooper

Video at 0:03:01. Shortly thereafter, Trooper Painter contacted dispatch to conduct a driver's

license check on the defendant's license and determine whether the defendant had any criminal

history. Trooper Video at 0:04:02. While waiting for dispatch to return the results on the check,

Trooper Painter asked some follow up questions concerning the defendant's travel plans.

Trooper Video at 0:04:56. Dispatch then returned the results of the requested check. Trooper

Video at 0:05:05. Trooper Painter then asked the defendant if the vehicle he was driving was a

rental vehicle and learned that the passenger in the vehicle had rented the vehicle and likely had

the rental agreement Trooper Video at 0:05:36-0:05-52.

While Trooper Painter continued working on his computer to complete the necessary

tasks to issue a warning, he asked the defendant about his employment. Trooper Video at

0:06:34. Trooper Painter then returned to asking the defendant about his travel plans. Trooper

Video at 0:06:47-0:08:30. Afterward, Trooper Painter approached the passenger side of the

rental vehicle again and made contact with Johnson. Trooper Video at 0:08:44. Trooper Painter

asked Johnson for his identification and the rental agreement. Trooper Video at

0:08:46-0:08:51. Trooper Painter then asked Johnson about his and the defendant's travel

plans. Trooper Video at 0:08:53-0:10:30. After obtaining Johnson's identification and the

rental agreement, Trooper Painter returned to his vehicle to continue completing the necessary

tasks for issuing a warning. Trooper Video at 0:10:45. Trooper Painter asked the defendant

10

further questions about his travel plans and the defendant's relationship with Johnson.

0:10:50-0:11:30. Trooper Painter then completed the traffic stop by issuing the warning to the

defendant and advising him "that's it." Trooper Video at 0:13:30. The defendant opened the

patrol vehicle door and began to exit. Trooper Video at 0:13:32.

Trooper Painter's conduct during the traffic stop was reasonably related in scope to

the circumstances surrounding the initial stop. Trooper Painter requested identification from the

defendant and verified the validity of his driver's license. *See Kitchell*, 653 F.3d at 1217.

Trooper Painter engaged the defendant in conversation about his travel plans and his

relationship to the defendant during the course of performing the duties associated with the

traffic stop. *See Rivera*, 867 F.2d at 1263; *see also Hernandez*, 93 F.3d at 1499. Trooper

Painter traveled back and forth between his patrol vehicle and the rental vehicle to obtain the

rental agreement from Johnson and verify his identity. *See Rice*, 483 F.3d at 1084; *see, e.g.*

*Kitchell*, 653 F.3d at 1218. "A traffic stop does not become unreasonable merely because the

officer asks questions unrelated to the initial purpose for the stop, provided that those questions

do not unreasonably extend the amount of time that the subject is delayed." *United States v.*

*Alcarez-Arellano*, 441 F.3d 1252, 1259 (10th Cir. 2006) *(*quoting *United States v. Martin*, 422

F.3d 597, 601-02 (7th Cir. 2005)). After completing the tasks necessary to the issuance of the

warning, Trooper Painter promptly issued the warning and advised the defendant he was free to

go. Trooper Video at 0:13:32. Accordingly, the length of the traffic stop was reasonable under

Fourth Amendment precedent.

**III.     Trooper Hyde had reasonable, articulable suspicion that criminal activity may
have been occurring.**

A "[t]raffic stop may be expanded beyond its original purpose if during the initial stop the detaining officer acquires reasonable suspicion of criminal activity, that is to say the officer must acquire a particularized and objective basis for suspecting the particular person stopped of criminal activity." *Kitchell*, 653 F.3d at 1217-18. Reasonable suspicion "represents a minimum level of objective justification which is considerably less than proof of wrongdoing by a preponderance of the evidence." *Alcarez-Arellan*o, 441 F.3d 1252, 1260 (10th Cir. 2006). Several factors may contribute to the formation of an objectively reasonable suspicion of illegal activity, including implausible travel plans and contradictory travel plans. *See United States v. Contreras*, 506 F.3d at 1031, 1036 (10th Cir. 2007); *see also United States v. McRae*, 81 F.3d 1528,1535 (10th Cir. 1996); *see United States v. Simpson*, 609 F.3d 1140, 1150 (10th Cir. 2010) ("Confusion about details is often an indication that a story is being fabricated on the spot."). Courts have also "[c]redited the idea that drug couriers often use third-party rental vehicles." *Contreras*, 506 F.3d at 1036.

Further, an officer may consider signs of nervousness in forming reasonable suspicion, but "[o]nly extraordinary and prolonged nervousness can weigh significantly in the assessment of reasonable suspicion." *United States v. Santos*, 403 F.3d 1120, 1127 (10th Cir. 2005). When making a reasonable suspicion determination, courts must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing. *See United States v. Arvizu*, 534 U.S. 266, 273 (2002). "This process allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them

that might well elude an untrained person." *Id.*

Trooper Painter developed an articulable and objectively reasonable suspicion that criminal activity was afoot during this traffic stop. The first potential indicator of criminal activity observed by Trooper Painter was Johnson's abrupt action of looking at Trooper Painter after he activated his emergency lights, followed by his pretending he was asleep when Trooper Painter first approached the vehicle. The second potential indicator of criminal activity was Johnson's nervousness as Trooper Painter noticed his heavy breathing and the rapidity of his heartbeat in his neck. Trooper Painter's suspicion was furthered by his observation of the defendant's nervousness during the course of the traffic stop. The government recognizes that nervousness is not given significant weight in the reasonable suspicion analysis, but the government submits that the persistent and increasing nervousness of the defendant and Johnson during the stop played a significant role in the development of Trooper Painter's reasonable suspicion.

Further, one of the most significant indicators of criminal activity was the implausibility and inconsistency of the travel plans related by the defendant and Johnson. The defendant claimed they traveled from St. Louis on Saturday and arrived in Las Vegas on Sunday (an approximate 24 hour trip), gambled for roughly 48 hours straight, and were en route back to St. Louis, on Wednesday, with the intention of arriving by Thursday. When asked about whether they slept during their trip, the defendant indicated they stayed "In the car", then, at the "Hampton, probably", followed by they slept in the car at the Hampton. Trooper Video at 0:07:26-0:07:42. The video recording clearly depicts, and Trooper Painter could readily

observe, that the defendant was fabricating his story on the spot. When Johnson was asked about his and the defendant's travel plans, Johnson indicated they were "visiting his [possibly Turrentine's] people" in "Oklahoma", specifically, they had been in Oklahoma City, they had been there a "couple of days", and they had not traveled anywhere else. Trooper Video at 0:09:03-0:10:27.[4] When Trooper Painter returned to his patrol vehicle, he asked the defendant some follow up questions with respect to his and Johnson's travel plans in an attempt to confirm or deny their stories. Trooper Video at 0:10:55-0:11:15. Trooper Painter was clearly able to determine that their stories did not match. Based on a totality of the circumstances analysis, and taking into account his experienced and specialized training, Trooper Painter observed several indicators that allowed him to develop an objective and reasonable articulable suspicion that criminal activity was afoot.

**IV.     Trooper Painter had sufficient probable cause to search the vehicle.**

"Officers with reasonable suspicion to believe the occupants of a vehicle are engaged in the unlawful transportation of contraband may detain the vehicle to obtain a properly trained dog to sniff for contraband." *United States v. Mendoza*, 468 F.3d 1256, 1261 (10th Cir. 2006). "[C]onsent is not required for a dog sniff of a lawfully detained vehicle." *United States v. Massie*, 65 F.3d 843, 849 (10th Cir. 1995). "A canine sniff on the exterior of a vehicle during a lawful traffic stop does not implicate legitimate privacy interests." *United States v. Williams*,

---

[4]Although not observed by the trooper during the traffic stop, the defendant began silently mouthing the words "Las Vegas" in the direction of Johnson as Johnson was being asked about their travel plans by Trooper Painter. The government believes this is significant in the context that Trooper Painter would testify while he was asking Johnson about their travel plans, Johnson would not make eye contact with Trooper Painter and appeared as if he was looking past Trooper Painter.

403 F.3d 1203, 1207 (10th Cir. 2005) (citing *Illinois v. Caballes*, 543 U.S. 405 (2005)). "[A] random dog sniff is not a search for Fourth Amendment purposes, and a positive dog alert gives officers probable cause to search." *United States v. Parada*, 577 F.3d 1275, 1281 (10th Cir. 2009). "Thus, the general rule [the court's] have followed is that a dog's alert to the presence of contraband is sufficient to provide probable cause." *Id*. at 1282. Moreover, a canine does not have to give final indication before probable cause is established. *Id.* (declining to adopt a stricter ruled, urged by the defendant, requiring a dog to give final indication before probable cause is established). The reliability of the canine that alerts in a particular case can be established by presenting evidence of the canine's training and certification. *See United States v. Bertram*, 307 Fed. Appx. 214, 215 (10th Cir. 2009) (unpublished).

Trooper Painter's request for a canine sniff was certainly supported by his reasonable suspicion that criminal activity was afoot. Moreover, the defendant and Johnson were not unnecessarily delayed in waiting for the arrival of the canine. Trooper Video at 0:13:33-0:15:55. Trooper Ty Owen (Trooper Owen) arrived and promptly deployed his CLEET certified narcotics detection canine[5], who is certified to detect marijuana, heroin, cocaine, and methamphetamine, around the vehicle. Trooper Video at 0:18:03. The canine, which is an aggressive alert canine, alerted to the presence of narcotics and the vehicle was subsequently searched. Thereafter, Trooper Painter and Trooper Owen discovered the cocaine charged in the Indictment and several other items supportive of the government's allegations. Accordingly, the positive alert of a certified narcotics detection canine provided the Troopers with probable cause to search the vehicle.

---

[5]Attachment 2- Canine Cleet Certification Certificate.

## CONCLUSION

Based on the foregoing, the government respectfully requests the Court summarily deny defendant's motion to suppress.

Respectfully submitted,

SANFORD C. COATS
United States Attorney


s/*Andre' B. Caldwell*
Assistant U.S. Attorney
Bar Number:  22092
210 Park Avenue, Suite 400
Oklahoma City, Oklahoma  73102
(405) 553-8700 (Office)
(405) 553-8888 (Fax)
andre.caldwell@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on February 21, 2012, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing and transmittal of a Notice of Electronic Filing to the following ECF registrants:  Teresa Brown.


s/*Andre' B. Caldwell*
Assistant U.S. Attorney

ABC:rb